William R Geiler, J.
Five plaintiffs, each a resident, taxpayer and qualified voter of one of the three towns and two cities comprising Nassau County, instituted this action for declaratory judgment. They requested that the court make the following declarations:
1. That section 104 of the Nassau County Charter (L. 1936, ch. 879, as amd.) is unconstitutional.
*1073 2. That section 150 and subdivision 4 of section 153 of the County Law are not applicable to Nassau County or in the alternative are unconstitutional.
3. That the Board of Supervisors of the County of Nassau shall adopt a constitutional plan of apportionment.
The defendants Nickerson and Petito admitted substantially all of the material allegations of the complaint and cross-claimed against the other defendants for essentially the same relief requested by the plaintiffs in their complaint.
The other defendants contested the declarations made by the plaintiffs and cross-claiming defendants except they admitted that section 150 and subdivision 4 of section 153 of the County Law are not applicable to Nassau County. Thus it is agreed that sections 150 and subdivision 4 of section 153 of the County Law are not applicable to Nassau County and therefore are not an issue in this proceeding.
The plaintiffs and cross-claiming defendants now move for summary judgment pursuant to CPLB 3212.
The governing body of the County of Nassau is the Board of Supervisors (hereinafter referred to as the Board). The membership of the Board is made up of the following elected officials:
1. Two Supervisors from the Town of Hempstead.
2. One Supervisor from the Town of North Hempstead.
3. One Supervisor from the Town of Oyster Bay.
4. One Supervisor from the City of Grlen Cove.
5. One Supervisor from the City of Long Beach.
How is the makeup of the Board arrived at? Subdivision 2 of section 104 of the County Charter contains the formula by which the Board is constituted and is as follows: ‘ ‘ The supervisor or supervisors of each town and city shall, except as otherwise provided in this article, be entitled to cast at meetings of the board of supervisors, a number of votes equal to the quotient in whole numbers obtained by dividing the number of inhabitants, excluding aliens, as determined by the latest federal census or state census, whichever is the later, of the town or city from which they may have been elected, by ten thousand; provided that where there is more than one supervisor from any town or city, the quotient so obtained shall be divided equally among the supervisors from such town or city, and further provided that no supervisor shall have less than one vote, nor shall the supervisor or supervisors of any town or city be entitled to cast more than fifty per centum of the total vote of said board.”
*1074 An analyzation of this section indicates that the following four requirements must be met to establish the representation and voting of the members of the Board:
1. The number of citizen inhabitants of each of Nassau’s three towns and two cities, as determined in the latest Federal or State census, shall be divided by 10,000 and the resulting quotient, in whole numbers, shall be the number of votes to be cast by each town’s and city’s Supervisor.
2. Where there is more than one Supervisor from any town, the votes shall be divided equally among such Supervisors.
3. No Supervisor shall have less than one vote.
4. The Supervisor or Supervisors of any town shall not, in the aggregate, cast more than 50% of the Board’s total vote.
Subdivision 3 of section 104 provides: ‘ ‘ The assignment of votes among members of the board of supervisors shall be readjusted within sixty days after the public announcement of the enumeration of the inhabitants of the county in each federal and state census if there be one. The county clerk shall make the calculations required by this section, publicly announce the result, and file the same with the board of supervisors, and thereupon each supervisor shall be entitled to cast the votes assigned to him by such calculation and not otherwise. The action of the county clerk in this respect shall be deemed to be a ministerial act and mandamus shall lie to compel his performance thereof.”
The 1960 Federal census figure, without an adjustment of the calculations to meet the fourth requirement of subdivision 2 of section 104, would have resulted in the following distribution of votes:
Inhabitants
Title Town or City (less aliens) Vote
36 36 28 21 2 2
Totals.................... 1,275,801 125
Thus, the County Clerk would have no problem of complying with the mandate of subdivision 3 of section 104 if he only had to meet the first three requirements of subdivision 2 of section 104.
However, the County Clerk, after receiving the 1960 Federal census, had to insure that the 11 supervisor or supervisors of any town shall not, in the aggregate, cast more than 50% of the Board’s total vote.” This requirement posed a problem for
Presiding Supervisor............ Hempstead) „OQ eoK
Supervisor.................... Hempstead/...............
Supervisor.................... Oyster Bay................ 285,545
Supervisor.................... North Hempstead.......... 213,225
Supervisor.................... Long Beach................ 25,654
Supervisor.................... Glen Cove................. 22,752 *1075 the Clerk. The votes of the two Hempstead Supervisors totaled more than 50% of the Board’s total vote. How should their votes be reduced?
The then County Attorney, in 1937, confronted with this problem, decided upon a method which, when applied to the 1962 census figures, resulted in the two Hempstead Supervisors’ votes being reduced to 31 votes each and still retaining the total vote at 125.
This meant that 63 affirmative votes would be required whenever the Board was required to take action by majority vote.
What happened to the 5 votes which each of the Hempstead Supervisors had prior to compliance with the fourth requirement above? The County Attorney in a letter to the Board dated December 8, 1937 clearly indicated what happened to these votes. He said that: “ they (the Hempstead Supervisors) will not be able ‘ to cast ’ the difference between the votes they have * * * and the votes which equal one-half * * * and must therefore discard the difference * * *. These votes cannot be cast, nor are they reallocated; they are lost to the Town of Hempstead.”
On January 29,1962, the County Clerk filed a certificate which complied with the County Attorney’s 1937 letter, reducing the vote of the two Hempstead Supervisors to 31, each, but giving to the other Supervisors the votes which are indicated above. This is the method which is presently employed by the Board in voting upon local laws, ordinances and resolutions.
Does the system of voting and representation, as presently contained in section 104 of the County Charter, as interpreted by the County Attorney in 1937 and the County Clerk in 1962 and as implemented by the Board, violate the principle of “ one man, one vote ”? What is the meaning of this rule?
The court, in the case of Reynolds v. Sims (377 U. S. 533, 565-566) while dealing with the problem of apportionment of seats in a State Legislature explained the meaning of this concept : ‘ ‘ Logically, in a society ostensibly grounded on representative government, it would seem reasonable that a majority of the people of a State could elect a majority of that State’s legislators. To conclude differently, and to sanction minority control of state legislative bodies, would appear to deny majority rights in a way that far surpasses any possible denial of minority rights that might otherwise be thought to result. Since legislatures are responsible for enacting laws by which all citizens are to be governed, they should be bodies which are collectively responsive to the popular will. And the concept of equal protection has been traditionally viewed as requiring the *1076 uniform treatment of persons standing in the same relation to the governmental action questioned or challenged. With respect to the allocation of legislative representation, all voters, as citizens of a State, stand in the same relation regardless of where they live. Any suggested criteria for the differentiation of citizens are insufficient to justify any discrimination, as to the weight of their votes, unless relevant to the permissible purposes of legislative apportionment. Since the achieving of fair and effective representation for all citizens is concededly the basic aim of legislative apportionment, we conclude that the Equal Protection Clause guarantees the opportunity for equal participation by all voters in the election of state legislators. Diluting the weight of votes because of place of residence impairs basic constitutional rights under the Fourteenth Amendment just as much as invidious discriminations based upon factors such as race, Brown v. Board of Education, 347 U. S. 483, or economic status, Griffin v. Illinois, 351 U. S. 12, Douglas v. California, 372 U. S. 353. Our constitutional system amply provides for the protection of minorities by means other than giving them majority control of state legislatures. And the democratic ideals of equality and majority rule, which have served this Nation so well in the past are hardly of any less significance for the present and the future.”
The court further clarified this concept in the following language (pp. 567-568): “ To the extent that a citizen’s right to vote is debased, he is that much less a citizen. The fact that an individual lives here or there is not a legitimate reason for overweighting or diluting the efficacy of his vote. The complexions of societies and civilizations change, often with amazing rapidity. A nation once primarily rural in character becomes predominantly urban. Representation schemes once fair and equitable become archaic and outdated. But the basic principle of representative government remains, and must remain, unchanged — the weight of a citizen’s vote cannot be made to depend on where he lives. Population is, of' necessity, the starting point for consideration and the controlling criterion for judgment in legislative apportionment controversies. A citizen, a qualified voter, is no more nor no less so because he lives in the city or on the farm. This is the clear and strong command of our Constitution’s Equal Protection Clause. This is an essential part of the concept of a government of laws and not men. This is at the heart of Lincoln’s vision of ‘ government of the people, by the people, [and] for the people.’ The Equal Protection Clause demands no less than substan *1077 tially equal state legislative representation for all citizens, of all places as well as of all races.”
Does the concept of “ one person, one vote ” as explained in Reynolds v. Sims (supra) apply to local legislative bodies? The Supreme Court of the United States answered this question in the case of Avery v. Midland County (390 U. S. 474). The County Court of Midland County, Texas consisted of five Commissioners, each of whom was elected from one of five separate districts varying in population from 414 to 67,906. The court held that the Midland County Commissioners Court was a unit of local government with general responsibility and power for local affairs and the Constitution does not permit substantial variation from equal population in drawing districts for such units. The reasoning of the court is contained in the following language appearing at page 481: 1 ‘ That the state legislature may itself be properly apportioned does not exempt subdivisions from the Fourteenth Amendment. While state legislatures exercise extensive power over their constituents and over the various units of local government, the States universally leave much policy and decisionmaking to their governmental subdivisions. Legislators enact many laws but do not attempt to reach those countless matters of local concern necessarily left wholly or partly to those who govern at the local level. What is more, in providing for the governments of their cities, counties, towns and districts, the States characteristically provide for representative government — for decisionmaking at the local level by representatives elected by the people. And, not infrequently, the delegation of power to local units is contained in constitutional provisions for local home rule which are immune from legislative interference. In a word, institutions of local government have always been a major aspect of our system, and their responsible and responsive operation is today of increasing importance to the quality of life of more and more of our citizens. We therefore see little difference, in terms of the application of-the Equal Protection Clause and of the principles of Reynolds v. Sims, between the exercise of state power through legislatures and its exercise by elected official in the cities, towns and counties.”
Thus, the constitutional mandate of “ one person, one vote ” applies to elective legislative bodies which exercise general governmental powers at the local level (see Iannucci v. Board of Supervisors, 20 N Y 2d 244; Seaman v. Fedourich, 16 N Y 2d 94).
Is the Nassau County Board of Supervisors an elective legislative body which exercises general governmental powers? *1078 There is no doubt that the Board is anything other than an elective legislative body which exercises general governmental powers. This is clearly established by an examination of the general powers of the Board as found in section 102 of the County Charter: “ The governing body of the county shall be the board of supervisors which, except as otherwise provided in this act, shall have and exercise all the powers and duties of the county together with all the powers and duties which now are, or may hereafter be conferred or imposed on boards of supervisors by laws applicable to such county not inconsistent with this act. The board of supervisors shall also have such other powers and duties as are provided by this act.”
In addition, the board has certain specific powers, including the power to make appropriations, to levy taxes and to incur indebtedness (County Charter, § 103).
Hence, the Board is clearly a “ unit of local government with general responsibility for local affairs ” within the meaning of the Avery case (supra). (See Ambro v. Board of Supervisors of Suffolk County, 55 Misc 2d 1019.)
Consequently, the apportionment of the Board must comply with the dictates of the equal protection clauses of the State and Federal Constitutions.
Does the plan of representation as embodied in section 104 of the County Charter meet the test of “ one man, one vote ”1
The only conclusion this court can reach is that the present scheme of apportionment, as mandated by section 104 of the charter, fails to comply with the principle of “ one man, one vote ”. The present plan is invalid because each citizen of the Town of Hempstead enjoys a voting status inferior to that of any other voter in Nassau County. These citizens cumulatively constitute substantially over 50% of the county’s population, yet their representatives have less than 50% of the Board’s total vote.
This court would be remiss if it condoned a plan of representation, which, merely because it has been in operation for 30 years, is on its face pregnant with inequities and is outwardly unconstitutional. The citizens of Hempstead would be justified in taking up the cry of their “ colonial ” predecessors of “no taxation without adequate representation.” Any system of representation which denies any citizen of our country the full weight of his vote is abhorrent to our principles of democracy.
The only remaining question is whether section 104 is invalid in its entirety.
*1079 Can only the provision limiting the vote of the Hempstead Supervisors be removed from section 104 and the balance of the section be left intact?
Careful examination of section 104 reveals that this section expresses a definite scheme of representation for an entire county. It is apparent that the provision, limiting the representation of any city or town, regardless of population, to a maximum percentage of the total votes, was intended by the Legislature as a safeguard which would prevent complete control over the Board from coming to rest in one geographic area.
The Town of Hempstead, at the time the charter was adopted in Nassau County, already had more than half the population of the county and it is quite probable that the other cities and towns insisted on such a safeguard and perhaps would not otherwise have accepted the proposed scheme for representation.
There is no doubt that each portion of section 104 is part of an over-all scheme and was never intended to be inseparable when the charter was accepted in 1938.
Therefore, section 104 is invalid in its entirety (Loew v. McNeill, 170 Misc. 647, affd. 279 N. Y. 806).
The court sees no need to examine the arguments of the plaintiffs and cross-claiming defendants with reference to the various weighted voting situations contained in their brief. These plans are not before the court and the court does not wish to rule on the constitutionality of voting schemes which may never be proposed.
The defendants are hereby directed to submit a plan or plans for apportionment and representation on the Board consistent with the principle of 1 ‘ one man, one vote ’ ’ within the next six months after service upon them of a copy of the judgment to be entered herein with notice of entry thereof.
The Board shall continue to operate in its present fashion until a new apportionment plan is put into operation.