George JACKSON, William Donald Stanford, Alonzo Hopkins, Kathryn Rogers, Francine Grier, Carlos E. Mackey, Elaine Nesin and David Ford, Plaintiffs,

v.

The NASSAU COUNTY BOARD OF SUPERVISORS, Joseph N. Mondello, Gregory P. Peterson, Benjamin L. Zwirn, Bruce Nyman, Angello A. Delligatti, Donald P. Deriggi, in their official capacities as members of the Nassau County Board of Supervisors, County of Nassau, Nassau County Board of Elections, Sinita Walker and John Matthews, in their official capacities as commissioners of the Nassau County Board of Elections, Defendants.

No. CV 91–3720 (ADS).

United States District Court, E.D. New York.

April 14, 1993.

Fried, Frank, Harris, Shriver & Jacobsen, New York City (Terrence A. Corrigan, Hon-

**510**

ey L. Kober, of counsel), for plaintiff David Ford.

Arthur N. Eisenberg, New York City, for the plaintiff George Jackson.

Julius Chambers, New York City, for plaintiffs Alonzo Hopkins, Kathryn Rogers, Francine Grier and Carlos E. Mackey.

Rivkin, Radler &. Kremer Uniondale, NY (William J. Lewis, Evan Krinick, of counsel), for defendant Nassau County Bd. of Sup'rs.

Peter S. Williams, Susan Friedman, Mineola, NY, for defendant Nassau County Bd. of Elections.

## OPINION AND ORDER

SPATT, District Judge.

"Within a given constituency, there can be room for but a single constitutional rule—one voter, one vote" (*Gray v. Sanders*, 372 U.S. 368, 382, 83 S.Ct. 801, 809, 9 L.Ed.2d 821 [1963]). In his concurrence in *Gray*, Justice Potter Stewart reaffirmed the right of political participation which reaches back to *The Federalist Papers* and forward to as yet unknown possibilities of electronic politics in the 21st century. One can only imagine what Hamilton, Madison and Jefferson would have thought of modern "PCs" and "MACs" humming overtime on complicated apportionment formulas.

Yet despite the growth of our population and the development of our complex technology, the fundamental character of the right to vote remains paramount, surfacing from time to time in issues raised about both the quantity and quality of representation. Whether these questions arise at the national or neighborhood level, as they do in the instant case, the fundamental principle of "one person, one vote" is unchanging. What does change is how Government carries out its mandate to retain the vitality of that basic precept.

In the case before the Court, eight voter-residents of Nassau County, in bringing this constitutional challenge, ask the Court to re-examine the structure of the legislative body which governs the County in light of the Supreme Court's reaffirmance of the "one person, one vote" rule in *New York City Bd.*

*of Estimate v. Morris,* 489 U.S. 688, 692–703, 109 S.Ct. 1433, 1437–1443, 103 L.Ed.2d 717 (1989).

## I. FACTUAL BACKGROUND

### A. The Parties

The eight plaintiffs are registered voters in the Towns of Hempstead and Glen Cove. Specifically, George Jackson and Elaine Nesin are White voters in the Town of Hempstead; William Donald Stanford, Alonzo Hopkins, Kathryn Rogers, Carlos E. Mackey and David Ford are Black voters in the Town of Hempstead; and Francine Grier is a Black voter in the Town of Glen Cove.

The defendant Nassau County Board of Supervisors, established in 1937 pursuant to the New York State Constitution, Article IX and Local Law of Nassau County Article 1, is the general legislative body for Nassau County. At the time this suit was commenced, the individual defendants held the following positions: Joseph Mondello, Presiding Supervisor of the Town of Hempstead; Gregory P. Peterson, Supervisor of the Town of Hempstead; Benjamin L. Zwirn, Supervisor of the Town of North Hempstead; Bruce Nyman, Supervisor of the City of Long Beach; Angelo A. Delligatti, Supervisor of the Town of Oyster Bay; and Donald P. DeRiggi, Mayor–Supervisor of the City of Glen Cove.

The defendant Nassau County Board of Elections has the responsibility for conducting elections for the Board of Supervisors. Defendants Sinita Walker and John Matthews are Commissioners of the defendant Board of Elections and they are responsible for the conduct of the elections in Nassau County.

Each individual defendant is sued in his or her official capacity.

### B. Jurisdiction

Jurisdiction in this case is based upon 28 U.S.C. §§ 1331 (federal question), 1343 (civil rights), 1357 (injury under federal laws), and 2201 (declaratory judgments). This action is brought under the aegis of the Equal Protection Clause of the Fourteenth Amendment, the Fifteenth Amendment to the United

States Constitution and pursuant to 42 U.S.C. §§ 1973, 1983 and 1985.

## C. *The Complaint*

The Nassau County Board of Supervisors serves as the legislative body for Nassau County and is composed of elected representatives from the County's five municipalities. As the largest municipality, the Town of Hempstead has two representatives on the Board; each of the other municipalities has one representative. These six lawmakers sitting on the Board are each "permitted to vote on proposed legislation in accordance with a weighted voting method devised by Prof. John F. Banzhaf III" (Complaint, ¶ 1). The particulars of the weighted voting plan are delineated at Points III and IV, *infra.* The Nassau County Board of Supervisors has, since 1917, used a system of weighted voting that gives more votes to Board members from the more populous towns and cities than to Board members from the less populous areas.

The Banzhaf method assertedly is intended to allow "municipalities with disparate populations to be represented on the County Board while purporting to satisfy the constitutional requirement that representation be proportionate to population" (id.). The plaintiffs contend that the United States Supreme Court rejected the Banzhaf methodology in *New York City Board of Estimate v. Morris,* 489 U.S. 688, 109 S.Ct. 1433, 103 L.Ed.2d 717 (1989), stating that it was "an unrealistic approach [for] determining whether citizens have an equal voice in electing their representatives" (*id.* at 698, 109 S.Ct. at 1440).

This suit consists of three causes of action. In their first claim, the plaintiffs allege that Nassau County's weighted voting system, which uses the Banzhaf method, allocates votes to each municipality in a manner that is not directly proportional to the population of the municipalities and therefore violates on its face the "one person, one vote" principle mandated by the Equal Protection Clause of the Fourteenth Amendment. In their second cause of action, the plaintiffs assert that the manner in which the Banzhaf Index is applied to the structure and voting functions of the Board of Supervisors is unconstitutional.

The third claim encompasses the alleged dilution of voting strength among Black and Hispanic voters in the County. With respect to this third claim, the plaintiffs contend that

"the use of a weighted voting scheme which permits the creation of large districts and further permits, in Hempstead, the election of representatives on an at-large basis has the effect of diluting the electoral opportunities of the minority communities in Nassau County and of denying these communities fair and effective representation in violation of Section 2 of the Federal Voting Rights Act, 42 U.S.C. § 1973 *et seq.*" (Complaint, ¶ 2).

Ultimately, the plaintiffs seek declaratory and injunctive relief to enforce the provisions of the First, Fourteenth and Fifteenth Amendments to the Constitution as well as Section 2 of the Voting Rights Act.

## D. *Prior Constitutional Challenges to the Weighted Voting Plan*

The arguments asserted by both sides in this controversy contain various interpretations of the previous cases dealing with the principle of "one person, one vote" and the concept of weighted voting in several counties within New York State. Therefore, it is necessary to review the actions which provide the background for the instant challenge before turning to the merits of the motion now before the Court.

### (1) *Iannucci v. Board of Supervisors*

In the mid–1960s, Washington County, a municipality in upstate New York, attempted to implement a plan of permanent reapportionment based on weighted voting (*see Iannucci v. Board of Supervisors of Washington County,* 27 A.D.2d 346, 279 N.Y.S.2d 458 [3d Dept.1967] ). The Supreme Court at Special Term issued an order invalidating the plan as unconstitutional.

On appeal, the Appellate Division, Third Department held that weighted voting on the county level as presented could not satisfy the "one person, one vote" mandate of *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506, *rehearing denied,* 379 U.S. 870, 85 S.Ct. 12, 13 L.Ed.2d 76 (1964). The court

went on to note that weighted voting, "although not as unrepresentative as the historical representation by town supervisors, is unconstitutional and the only practical solution to the problem of reapportionment is by the method of district representatives based on population or, perhaps, by the county wide election of supervisors at large" (*id.*, 279 N.Y.S.2d at 459). In reaching its decision, the Third Department observed that while weighted voting cures the previous favoritism in areas of smaller population, "it by the very system itself creates new inequities in terms of power" (*id.*). The board was directed to prepare and submit a permanent plan of reapportionment within ten days. It adopted an "Adjusted Weighted Voting Plan."

The New York State Court of Appeals thereafter reviewed the Washington County case, along with a reapportionment action from Saratoga County, and found that both boards as then constituted were "malapportioned" and violative of the "one person, one vote" principle (*Iannucci v. Board of Supervisors of Washington County*, 20 N.Y.2d 244, 249, 282 N.Y.S.2d 502, 506, 229 N.E.2d 195, 197 [1967] ). In reaching this conclusion, the court cited Prof. John Banzhaf's work on weighted voting, noting that the "significant standard for measuring a legislator's voting power ... is not the number of fractions of votes which he may cast but, rather, his 'ability ... by his vote, to affect the passage or defeat of a measure' " (*id.* at 251, 282 N.Y.S.2d 502, 229 N.E.2d 195, quoting Banzhaf, "Weighted Voting Doesn't Work: A Mathematical Analysis," 19 RUTGERS L.REV. 317, at 318).

The court did not hold that weighted voting plans are unconstitutional *per se*, but did point out their fundamental flaws, as follows:

"[t]he principle of one man-one vote is violated, however, when the power of a representative to affect the passage of legislation by his vote, rather than by influencing his colleagues, does not roughly correspond to the proportion of the population in his constituency. Thus, for example, a particular weighted voting plan would be invalid if 60% of the population were represented by a single legislator who was entitled to cast 60% of the votes.

Although his vote would apparently be weighted only in proportion to the population he represented, he would actually possess 100% of the voting power whenever a simple majority was all that was necessary to enact legislation. Similarly, a plan would be invalid if it was 'mathematically impossible' for a particular legislator representing say 5% of the population to ever cast a decisive vote. Ideally, in any weighted voting plan, it should be mathematically possible for every member of the legislative body to cast the decisive vote on legislation in the same ratio which the population of his constituency bears to the total population. Only then would a member representing 5% of the population have, at least in theory, the same voting power (5%) under a weighted voting plan as he would have in a legislative body which did not use weighted voting—e.g., as a member of a 20-member body with each member entitled to cast a single vote. This is what is meant by the one man-one vote principle as applied to weighted voting plans for municipal governments. A legislator's voting power, measured by the mathematical possibility of his casting a decisive vote, must approximate the power he would have in a legislative body which did not employ weighted voting" (*Iannucci*, 20 N.Y.2d at 252, 282 N.Y.S.2d 502, 229 N.E.2d 195).

In order to measure the mathematical voting power of each member of the county boards of supervisors, the court found that the opinions of experts using computer analyses would be necessary—an expensive proposition (*id.* at 252–253, 282 N.Y.S.2d 502, 229 N.E.2d 195). The court further found that the boards are not entitled to rely on a presumption that their legislative acts are constitutional. Such a presumption

"is derived from the principle that it is improper for a court, in passing upon a constitutional question, to lightly disregard the considered judgment of a legislative body which is also charged with a duty to uphold the Constitution. With respect to weighted voting, however, a 'considered' judgment is impossible without computer analyses and, accordingly, if the boards

choose to reapportion themselves by the use of weighted voting, there is no alternative but to require them to come forward with such analyses and demonstrate the validity of their reapportionment plans" (*id.* at 254, 282 N.Y.S.2d 502, 229 N.E.2d 195).

Prophetically, the court's last word was one of caution—that such reapportionment cases had the potential to drag the courts unnecessarily into a "mathematical quagmire" (*id,* citing *Baker v. Carr,* 369 U.S. 186, 268, 82 S.Ct. 691, 738, 7 L.Ed.2d 663 [1962]).

### (2) *Franklin v. Mandeville*

In 1968, five plaintiffs, each of whom was a resident, taxpayer, and qualified voter of one of the three towns and two cities comprising Nassau County brought an action for declaratory judgment, seeking an order declaring unconstitutional Section 104 of the Nassau County Charter, Laws 1936, c. 879, as violative of the "one person, one vote" principle (*see Franklin v. Mandeville,* 57 Misc.2d 1072, 294 N.Y.S.2d 141 [Sup.Ct.Nassau Cty.1968]). Citing *Iannucci,* the Supreme Court, Nassau County held that the concept of "one person, one vote" applied to local legislative bodies (*id.,* 294 N.Y.S.2d at 146).

Specifically, the court found that the scheme of apportionment which was mandated by the county charter failed to comply with the dictates of the Equal Protection Clause of the State and Federal Constitutions, and was therefore invalid in its entirety (*id.,* 294 N.Y.S.2d at 147–148). Stating that the only conclusion which could be reached was that Section 104 was not in compliance, the court noted that

"[t]he present plan is invalid because each citizen of the Town of Hempstead enjoys a voting status inferior to that of any other voter in Nassau County. These citizens cumulatively constitute substantially over 50 per cent of the County's population, yet their representatives have less than 50 per cent of the Board's total vote" (*id.,* 294 N.Y.S.2d at 148).

The court ultimately directed the defendants to submit a reapportionment plan consistent with the "one person, one vote" principle within six months of the judgment.

On appeal, the Appellate Division, Second Department agreed with the findings of Special Term that the weighted voting plan for the election of Supervisors of the County of Nassau violated the "one person, one vote" precept as explained in *Reynolds v. Sims* (*see Franklin v. Mandeville,* 32 A.D.2d 549, 299 N.Y.S.2d 953, 954 [2d Dept.1969]). In affirming for the reasons stated in the opinion below, the Second Department noted that it was unnecessary to take testimony on whether the plan was also invalid under the premise set forth in *Iannucci* in that it did not accord to each legislator the voting power measured by the mathematical possibility of his casting a decisive vote (*id.,* 299 N.Y.S.2d at 955).

The Court of Appeals affirmed the decision in principle but modified the order to direct that a valid reapportionment plan be adopted by the Board within six months after public announcement of the results of the 1970, rather than the 1960, federal census concerning the number of inhabitants in Nassau County (*Franklin v. Mandeville,* 26 N.Y.2d 65, 69–70, 308 N.Y.S.2d 375, 377, 256 N.E.2d 534, 535 [1970]). In referring to Section 104, the Court of Appeals observed that "inequality in some degree is mandated and, indeed, perpetuated by the charter provision ... a vital factor which distinguishes the case from *Abate v. Mundt,* 25 N.Y.2d 309, 305 N.Y.S.2d 465 [253 N.E.2d 189], recently decided" (*id.* at 69, 308 N.Y.S.2d 375, 256 N.E.2d 534).

A brief word about *Abate v. Mundt* is necessary here since both parties rely to some extent on this case as support for their arguments. In *Abate,* the New York Court of Appeals found that for the purpose of determining whether a particular plan of apportionment meets the requirements of the Equal Protection Clause, the question is whether the plan adequately apportions representatives *on a population basis* (*Abate v. Mundt,* 25 N.Y.2d 309, 314, 305 N.Y.S.2d 465, 466–467, 253 N.E.2d 189, 190–191 [1969]) (emphasis supplied). In response to a reapportionment suit brought by taxpayers, the Rockland County Board of Supervisors submitted a plan calling for a County Legislature of 18 members chosen from five districts corresponding to the county's five constituent

towns (*id.* at 313, 305 N.Y.S.2d 465, 253 N.E.2d 189). The smallest district with a population of 12,114 was assigned one representative in the County Legislature; the number of representatives of each of the other districts was determined by dividing the population of each remaining district by the population of the smallest district, with any fractional results rounded to the nearest integer (*id.*).

In affirming the Appellate Division's approval of the plan, the Court of Appeals observed that "the issue is not to be resolved merely in terms of a sterile mathematical exercise" and held that a 12% variation in the number of people per legislator was not of itself "sufficient to render the plan constitutionally defective" (*id.* at 314–315, 305 N.Y.S.2d 465, 253 N.E.2d 189).

The Supreme Court granted *certiorari* in the case and affirmed the New York Court of Appeals decision upholding the plan (*see Abate v. Mundt,* 403 U.S. 182, 91 S.Ct. 1904, 29 L.Ed.2d 399 [1971] ). In cautioning about apportionment structures that contain a built-in bias, the court found that there was no such indigenous bias in the Rockland County plan (*id.* at 186, 91 S.Ct. at 1907). In making that observation, the court also noted the following:

> "[w]e emphasize that our decision is based on the long tradition of overlapping functions and dual personnel in Rockland County government and on the fact that the plan before us does not contain a built-in bias tending to favor particular political interests or geographic areas. *And nothing we say today should be taken to imply that even these factors could justify substantially greater deviations from population equality* " (*id.* at 187, 91 S.Ct. at 1908) (emphasis supplied).

### (3) *Franklin v. Krause*

The Nassau County Board of Supervisors did not adopt a plan within the six month period mandated by the Court of Appeals, but rather introduced a plan on August 14, 1972, which it subsequently adopted on September 25, 1972 as Local Law No. 13–1972 (*see Franklin v. Krause,* 72 Misc.2d 104, 338 N.Y.S.2d 561, 563 [Sup.Ct., Nassau Cty.

1972] ). Again the plaintiffs brought an action in Supreme Court, Nassau County for an order appointing a non-partisan commission to prepare a plan, asserting that since the Board of Supervisors had not acted within the specified time, the Board "forfeited the right to adopt a plan of its own" (*id.,* 338 N.Y.S.2d at 562).

The plaintiffs further contended that the plan adopted by the Board on September 25, 1972 was only a "warmed over version of one previously held unconstitutional by the Court of Appeals" and was itself unconstitutional. In setting the standard for the allocation of votes, Local Law No. 13–1972 provided for the following:

> "the 'voting power' of a Supervisor shall be measured 'by the mathematical possibility of his casting a decisive vote on a particular matter.' ... the percentages of voting power 'shall approximate' the corresponding percentages of population and it further guarantees that no town or city shall be wholly without voting power.

> Finally, in establishing its general standards for the system, the new plan requires that in preparing each reapportionment of votes defendant-Board shall employ 'an independent computerized mathematical analysis' and any other methods which shall 'most nearly analyze' the percentages of voting power and population" (*id.,* 338 N.Y.S.2d at 563).

Working with the assistance of an independent computerized analysis, the Board arrived at a total of 130 votes to be allocated, divided as follows: Hempstead—Presiding Supervisor (35 votes); Hempstead—Supervisor (35); Oyster Bay (32); North Hempstead (23); Long Beach (3); and Glen Cove (2) (*id.,* 338 N.Y.S.2d at 564). The number of votes to achieve a majority was set at 71, while a "two-thirds" vote would require 92. "The computer then calculates the number of decisive votes each Supervisor may cast, then the respective percentages of voting power and, finally, for comparison purposes, the corresponding percentage of the population" (*id.*).

In terms of relevant percentages and deviations, the new "majority" plan resulted in the following figures:

|  | Percentages of Population | Percentages of Voting Power | Deviation |
|---|---|---|---|
| Hempstead (Total) | 56.2 | 54.6 | − 1.6 |
| Oyster Bay | 23.1 | 20.4 | − 2.7 |
| North Hempstead | 16.5 | 13.0 | − 3.5 |
| Long Beach | 2.3 | 5.6 | + 3.3 |
| Glen Cove | 1.8 | 5.6 | + 3.8 |

A "two-thirds" vote would require the following:

|  | Percentages of Population | Percentages of Voting Power | Deviation |
|---|---|---|---|
| Hempstead (Total) | 56.2 | 50.0 | − 6.2 |
| Oyster Bay | 23.1 | 20.8 | − 2.3 |
| North Hempstead | 16.5 | 20.8 | + 4.3 |
| Long Beach | 2.3 | 4.2 | + 1.9 |
| Glen Cove | 1.8 | 4.2 | + 2.4 |

According to the Board of Supervisors, this schematic satisfied the standard set in *Iannucci v. Board of Supervisors, supra*, 20 N.Y.2d at p. 282, 282 N.Y.S.2d 502, 229 N.E.2d 195.

However, the Supreme Court, Nassau County disagreed, noting that the plan "by giving Hempstead 70 votes and requiring 71 votes for a majority allows Hempstead about 54% of the votes but requires about 54.6% of the votes to carry" (*id.*). This would require at least one vote from another municipality on the Board for a measure to carry, even though Hempstead had 56.27% of the population. As the court summarized, "under the Plan now adopted, the Hempstead Supervisors are still barred from exercising a majority vote" (*id.*, 338 N.Y.S.2d at 565). In addition, under this Plan, the City of Glen Cove was given voting power "greater than three times its share of its population and voting power equal to the City of Long Beach, which has one-third greater population than the City of Glen Cove" (*id.*).

In its opinion, the court also cited sections of then County Executive Ralph Caso's veto message concerning the plan:

" 'In effect, the proposed law would retain the present Board of Supervisors without material change. . . .

The proponents of the local law urge that the amendments now contain a constitutionally valid plan of reapportionment when considered in terms of "voting power" as determined by a computer.

While weighted voting is not illegal *per se*, the mathematical gyrations necessary to preserve some effective voting power for the smaller political units represented on the Board require the destruction of principles of majoritarean democracy. And, while this principle is not inviolate in those circumstances where a practical and rational basis exists for deviation, it cannot be ignored in the face of viable alternatives.

To say that a majority is not a majority for the mere sake of preserving one of many available forms of reapportionment is an unnecessary debasement of the rights of the voters' " (*id.*, 338 N.Y.S.2d at 565–566).

The court went on to note that weighted voting was looked upon by most courts, including the Court of Appeals, as an "interim" or "stopgap" measure, not one that was constitutionally acceptable as a permanent plan of reapportionment (*id.*, citing *Graham v. Board of Supervisors*, 18 N.Y.2d 672, 674,

273 N.Y.S.2d 419, 421, 219 N.E.2d 870, 871 [1966] ). Relying on decisions such as *Graham*, the court concluded that "from the standpoint of weighted voting, the plan adopted September 25, 1972 by the defendant-Board does not comply with the requirements set by the New York Court of Appeals" and was therefore unconstitutional as violative of the Equal Protection Clause of the State and Federal Constitutions (*id.*, 338 N.Y.S.2d at 569). The court then directed the Board to propose a new plan "based upon a system not utilizing weighted voting" within sixty days (*id.*, 338 N.Y.S.2d at 570).

Upon direct appeal, the Court of Appeals reviewed the plan and noted that even though the "smaller communities are super-enfranchised to a somewhat greater extent than the larger communities are disenfranchised ... the range of deviation is only 7.3% and the plan fits comfortably within the intendment of *Iannucci v. Board of Supervisors of County of Washington* [citations omitted] as affected by subsequent case law" (*Franklin v. Krause*, 32 N.Y.S.2d 234, 237, 344 N.Y.S.2d 885, 887, 298 N.E.2d 68, 69, reargument denied, motion to amend remittitur granted, 33 N.Y.2d 646, 348 N.Y.S.2d 554, 303 N.E.2d 71 [1973] appeal dismissed for want of a substantial federal question, 415 U.S. 904, 94 S.Ct. 1397, 39 L.Ed.2d 461 [1974] ).

The Court of Appeals cited Judge Burke's words in *Abate v. Mundt* that "variations from a pure population standard might be justified by such state policy considerations as the integrity of political subdivisions, the maintenance of compactness and contiguity in legislative districts or the recognition of natural or historical boundary lines" (*id.* at 239, 344 N.Y.S.2d 885, 298 N.E.2d 68, quoting *Abate v. Mundt*, 25 N.Y.2d at 316, 305 N.Y.S.2d 465, 253 N.E.2d 189). However, in *Matter of Schneider v. Rockefeller*, 31 N.Y.2d 420, 340 N.Y.S.2d 889, 293 N.E.2d 67 (1972), the Court of Appeals cautioned that *Abate v. Mundt* was applicable only to units of local government, with apportionment problems distinct from their state and national counterparts (*id.* at 428, 340 N.Y.S.2d 889, 293 N.E.2d 67).

The court in *Krause* placed particular reliance on footnote 3 of the *Schneider* opinion which, according to Judge Gabrielli,

"distills the more recent thinking that the one man, one vote ideal, while not to be abandoned at the local level, can at least be tempered to meet local exigencies and preserve boundary lines. The plan before us comports with the standards set forth in *Iannucci v. Board of Supervisors of County of Washington* [citations omitted] as closely as is possible, given the unique situation created by Hempstead's size with the disparities in population among the other units. The fact that the plan still carries the problem found decisive in *Franklin v. Mandeville* should not constitute a continuing bar to validation.

\*    \*    \*    \*    \*    \*

The plan before us has been 'computerized' as suggested by the *Iannucci* requirement and moves close to one man, one vote without granting Hempstead 100% voting power. The total deviation is 7.3%, a tolerable figure within the contemplation of *Abate* and other recent cases....

In no way are we suggesting that the one man, one vote principle be abandoned at the local level. We will continue to insist that this ideal be the goal and that *Iannucci* be the guide. We merely conclude that the *plan before us* meets a sufficient standard when measured against *the law as it now is* with regard to local government. This law has assumed a desirable practicality because it allows for flexibility—something which at least prior to *Abate v. Mundt* [citations omitted] was lacking" (*id.* at 242, 344 N.Y.S.2d 885, 298 N.E.2d 68) (emphasis supplied).

Based on these findings, the Court of Appeals held there was no constitutional infirmity in Local Law No. 13–1972.

The Supreme Court received the case under its mandatory appellate jurisdiction, 28 U.S.C. § 1257(2), but dismissed for want of a substantial federal question (*Franklin v. Krause*, 415 U.S. 904, 94 S.Ct. 1397, 39 L.Ed.2d 461 [1974] ).

## (4) *Bechtle v. Board of Supervisors*

Another constitutional challenge to the Nassau County Board of Supervisors was brought by a group of resident taxpayers in 1980. The Appellate Division, Second Department heard the appeal of the Supreme Court, Nassau County's grant of summary judgment in favor of the defendants dismissing the complaint (*Bechtle v. Board of Supervisors of County of Nassau*, 81 A.D.2d 571, 441 N.Y.S.2d 403 [2d Dept.1981] ).

In a Memorandum Decision, the Second Department affirmed the judgment, stating that "[t]he doctrine of *stare decisis* precludes this court from making a different determination on the merits of this matter" (*id.*). However, the court added that "[i]n our opinion, questions of law have arisen which ought to be reviewed by the Court of Appeals" (*id.*). The Court of Appeals, in a Memorandum Decision, stated simply that "[o]n summary consideration ... order affirmed with costs [*see Franklin v. Krause*, 32 N.Y.2d 234, 344 N.Y.S.2d 885, 298 N.E.2d 68, app. dmsd. 415 U.S. 904, 94 S.Ct. 1397, 39 L.Ed.2d 461 ...]" (*Bechtle v. Board of Supervisors of County of Nassau*, 54 N.Y.2d 674, 442 N.Y.S.2d 509, 425 N.E.2d 897 [1981] ).

## (5) *League of Women Voters v. Board of Supervisors*

In 1982, five registered voters as well as the League of Women Voters of Nassau County brought an action in the Federal Court for the Eastern District of New York seeking a declaratory judgment that Local Law 2–1982, which amended Section 104(5) of the Nassau County Government Law, was unconstitutional as violative of the Equal Protection Clause of the Fourteenth Amendment. In their Answer, the defendant Supervisors and the Board asserted the affirmative defense of "res judicata and/or stare decisis" based on *Franklin v. Krause*, 32 N.Y.2d 234, 344 N.Y.S.2d 885, 298 N.E.2d 68 (1973) (*see League of Women Voters of Nassau County v. Nassau County Board of Supervisors*, CV 82–1607 [E.D.N.Y. May 18, 1983] [Mishler, J.] ).

Section 104, sub-paragraph 3 of the Nassau County Government Law required the Board of Supervisors to amend subdivision 5 "not later than six months after the publication of the results of each federal decennial census ... [to] propose a reapportionment of the voting power of the members of the board of supervisors" (*id.* at 2–3). Section 104(4)(h) required the Board to employ an independent computerized mathematical analysis in preparing each reapportionment and "such other method or methods as shall most nearly equalize the percentage of voting power of each town and city to its percentage of the total county population." When the 1980 census was published, the Board hired an expert to prepare such an analysis (*id.*).

The Board of Supervisors adopted Local Law 2–1982 on March 8, 1982, amending Section 104(5) by providing for a total of 108 votes to reflect the population decrease in the County, with 65 votes necessary for a majority (*id.*). The revised percentages and deviations appeared as follows:

| Municipality | Population | Percent of Population | No. of Votes | Percent Voting Power |
|---|---|---|---|---|
| Hempstead | 738,517 | 55.92 | * 58 | 53.85 |
| Oyster Bay | 305,750 | 23.12 | 22 | 21.15 |
| No. Hempstead | 218,624 | 16.53 | 15 | 17.31 |
| Long Beach | 34,073 | 2.58 | 7 | 5.77 |
| Glen Cove | 24,618 | 1.86 | 6 | 1.92 |

* The presiding supervisor was assigned 30 votes; the supervisor was assigned 28 votes.

In discussing the impact of the prior New York Court of Appeals decision in *Franklin v. Krause,* the court noted that the plaintiffs themselves conceded that the range of deviation under then Section 104(5) was smaller than the 7.3% range of deviation which the court upheld in *Krause (id.* at 5). However, the plaintiffs argued that the court in *Franklin v. Krause* miscalculated the range of deviation, and that the correct method of computation would result in a 232% deviation (*id.*). In applying the methodology he believed was espoused in *Krause,* the court arrived at a range of deviation of either 6.15% or 5.26%, "depending on whether the voting power of the presiding supervisor and supervisor of Hempstead is combined or considered separately" (*id.* at 6). These figures were calculated by adding Glen Cove's 3.8% overrepresented voting power with North Hempstead's 3.5% underrepresented voting power. These figures were reflected in the following table:

| | Percentages of Population | Percentages of Voting Power | Deviation |
|---|---|---|---|
| Hempstead Pres. Supv. | 27.96 | 28.85 | + .89 |
| Supervisor Hemp. | 27.96 | 25.00 | − 2.96 |
| Total: | 55.92 | 53.85 | − 2.07* |
| Oyster Bay | 23.12 | 21.15 | − 1.97 |
| North Hempstead | 16.53 | 17.31 | + .78 |
| Long Beach | 2.58 | 5.77 | +3.19** |
| Glen Cove | 1.86 | 1.92 | + .06 |

\* Most underrepresented

\*\* Most overrepresented

Range of Deviation:     2.07 + 3.19 = 5.26%

---

The plaintiffs suggested that the degree of over or underrepresentation was "not simply the discrepancy between population and voting power, but rather the ratio of that figure to the municipality's population" (*id.* at 7). The plaintiffs then asserted that their approach was the proper mathematical method for testing a weighted voting plan under the standard set forth in *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). However, the court found no such suggestion in *Reynolds,* and observed that the violation in *Reynolds* was the failure to make population the controlling factor in apportioning the legislature.

Relying on *Abate v. Mundt, supra,* 403 U.S. at 184–186, 91 S.Ct. at 1906–1907, Judge Mishler stated the following:

"[u]nder Local Law 2–1982, population is the controlling though perhaps not the only factor in the apportioning of weighted votes among the municipalities in Nassau County. Moreover, the relative voting strength of the municipalities parallels their relative populations. The Constitution does not require more. The County acted properly in permitting some variance from ideal population to voting power ratios in order to preserve existing subdivision lines and the existing legislative structure" (*id.* at 9–10).

Ultimately, the court granted the defendants' motion for summary judgment and dismissed the complaint, finding the appointment plan contained in Local Law 2–1982 to be an "adequate compromise between the constitutional one man, one vote requirement and the County's interest" in preserving the legislative structure (*id.* at 12).

On appeal, the Second Circuit found that the League of Women Voters did not have standing under section 1983 to assert the

rights of its members in challenging the weighted voting system (*see League of Women Voters v. Nassau County Bd.*, 737 F.2d 155 [2d Cir.1984], *cert. denied sub nom., Schmertz v. Nassau County Board of Supervisors*, 469 U.S. 1108, 105 S.Ct. 783, 83 L.Ed.2d 778 [1985] ). The Court of Appeals further found that the plaintiff-voters who resided in the overrepresented municipalities also lacked standing because they could not claim any injury (*id.* at 161). The inquiry on appeal, then, was limited to the plaintiffs who lived in underrepresented municipalities (*id.* at 162, citing *Baker v. Carr*, 369 U.S. at 206, 82 S.Ct. at 704).

With regard to the remaining plaintiffs' challenge to Nassau County's weighted voting system as a whole, the Second Circuit agreed with the defendants that the Supreme Court's summary adjudication in *Franklin v. Krause*, 32 N.Y.2d 234, 344 N.Y.S.2d 885, 298 N.E.2d 68 (1973), *appeal dismissed*, 415 U.S. 904, 94 S.Ct. 1397, 39 L.Ed.2d 461, upholding the weighted voting system as a whole, was dispositive of the constitutionality issue regarding Local Law 2–1982 (*League of Women Voters*, 737 F.2d at 162).

Citing *Hicks v. Miranda*, 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975), the Second Circuit drew attention to the Supreme Court's clarification of the import of its summary adjudications on later lower court decisions (*id.*). Specifically, in *Hicks*, the Supreme Court held that lower courts are bound by summary actions on the merits, but that " 'ascertaining the reach and content of summary actions may itself present issues of real substance.' Because a summary affirmance is an affirmance of the judgment only, the rationale of the affirmance may not be gleaned solely from the opinion below" (*Fusari v. Steinberg*, 419 U.S. 379, 391–392, 95 S.Ct. 533, 540, 541, 42 L.Ed.2d 521 [1975] [Burger, C.J., concurring], quoting *Hicks v. Miranda*, 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223). In *Mandel v. Bradley*, 432 U.S. 173, 176, 97 S.Ct. 2238, 2240 (1977), the Supreme Court further underscored the duties of lower courts on summary adjudications:

"[s]ummary affirmances and dismissals for want of a substantial federal question without doubt reject the specific challenges presented in the statement of jurisdiction and do leave undisturbed the judgment appealed from. They do prevent lower courts from coming to opposite conclusions on the precise issues presented and necessarily decided by those actions.... Summary actions ... should not be understood as breaking new ground but as applying principles established by prior decisions to the particular facts involved" (*id.* at 176, 97 S.Ct. at 2240).

The Second Circuit's opinion in *League of Women Voters* has further ramifications affecting this case which are discussed later in this opinion.

With regard to this case, all argument would have ceased of necessity at this point in the historical review of the pertinent precedents on the basis of *Franklin v. Krause* if not for the Supreme Court's decision in *Board of Estimate v. Morris*, 489 U.S. 688, 109 S.Ct. 1433, 103 L.Ed.2d 717 (1989). Following along this judicial path in the "one person, one vote" field, it is essential for the Court to scrutinize closely the Supreme Court's holding in *Morris*, upon which the plaintiff's first two causes of action hinge.

### (6) *Morris v. Board of Estimate*

By the time the Second Circuit had rendered its opinion in *League of Women Voters*, a Federal Court in the Eastern District of New York had already fired the opening salvo in *Morris v. Board of Estimate*, 551 F.Supp. 652 (E.D.N.Y.1982). The original suit was brought by three Brooklyn residents in December, 1981, charging that the New York City Board of Estimate deprived them of equal protection under the Fourteenth Amendment, and specifically that sections 61 and 62 of the New York City Charter devalued their ballots by violating the "one person, one vote" rule. The District Court granted summary judgment to the defendants in December, 1982, finding that the Board of Estimate was not subject to the constitutional principle of "one person, one vote" (*id.* at 657).

At this point, it is necessary to provide an abbreviated factual background concerning the make-up and responsibility of the Board of Estimate. The Board was comprised of three city-wide officials, namely, the Mayor,

the Comptroller, and the City Council President as well as the presidents of the five boroughs of New York City. The city-wide officials were elected to their offices by majority vote of the entire voting electorate. The five borough presidents, on the other hand, were elected only by the voters residing in their individual boroughs and each exercised a single vote. The city-wide officials exercised two votes each, for a total of six, which constituted a majority (*id.* at 654).

In *Morris*, the plaintiffs contended that such an equal distribution of voting power among the borough presidents was an "unconstitutional dilution of the voting rights of Brooklyn residents who substantially outnumber the populations of the other boroughs, especially the considerably less populous Borough of Richmond (Staten Island)" (*id.* at 653). The defendants responded that the Board "as a unique instrumentality of local government" was not subject to the "one person, one vote" principle (*id.*). Reasoning that the Board was not an elected body, but rather consisted of a group of public officials who were already constitutionally elected to their respective offices as required by law, the District Court held that the Board was not subject to the "one person, one vote" rule. The court distinguished the case from prior cases such as *Abate v. Mundt*, on the basis that the malapportionment in prior actions dealt with *elected* governing bodies (*id.* at 656–657).

On appeal, the Second Circuit stated that the court's fundamental task was to "determine whether the Board of Estimate is selected by 'popular election' and whether it performs 'governmental functions'" (*Morris v. Board of Estimate*, 707 F.2d 686, 689 [2d Cir.1983]). In reversing the District Court, Judge Lasker observed the following:

"[u]pon election to their respective positions, they automatically become Board members as a matter of law. . . .

It follows that the Board of Estimate is not an appointed body; its membership is definitively determined by election and by election alone.

.      .      .      .      .

Moreover, the question of applicability of the Equal Protection Clause to 'ex officio' boards was settled in this Circuit in *Bianchi v. Griffing*, 393 F.2d 457 (2d Cir.1968). In *Bianchi*, we held the one person, one vote principle applicable to a county board of supervisors selected in a manner virtually indistinguishable from the process by which the Board of Estimate is chosen." (*id.*).

Based on the fact that the Board was selected by popular election and performed general governmental functions, the Second Circuit concluded that the principle of one person, one vote applied. In remanding the case, the court stated that the District Court must decide on an appropriate methodology and determine the degree of malapportionment and "rule on the policies and interests which the Supreme Court has held may justify deviations from the literal one person, one vote formula" (*id.* at 690).

On remand, the parties stipulated to a bifurcated proceeding. The first phase would be geared to identifying the "most suitable mathematical measure" to superimpose "over the Board's electoral scheme to ascertain the malapportionment" (*Morris v. Board of Estimate*, 592 F.Supp. 1462, 1464 [E.D.N.Y.1984]). If the results yielded more than a minor deviation, the second phase of the proceeding would focus upon the acceptability of that variation in the context of prior Supreme Court decisions (*id.*).

As the District Court noted, the typical issue in a reapportionment case is "whether the population deviations from the average district are impermissibly large. . . ." (*id.*). However, the court also added that fair apportionment has another dimension—the qualitative aspect. The court went on to explain:

"[t]he quantitative dimension—captured by the one-person-one-vote standard—requires that each *individual's* vote be of equal weight, and is compromised when districts are of unequal population. Mere numerical equality among voting districts, however, 'does not guarantee "substantive equality in the sharing of power."' The qualitative dimension, therefore, requires

that individuals be able to act in effective voices in representation" (*id.*, quoting "The Supreme Court 1982 Term—Elections, 97 HARV.L.REV. 135, 139 [1983] [emphasis in the original] ).

The plaintiffs in *Morris* limited their attack to the quantitative aspect, and as such, the suit's outcome was "governed mainly by the Board's variance from the one person, one vote principle" (*Morris v. Board of Estimate*, 592 F.Supp. at 1466). In *Brown v. Thomson*, 462 U.S. 835, 842, 103 S.Ct. 2690, 2696, 77 L.Ed.2d 214 (1983), the Supreme Court indicated that an apportionment plan with a maximum population deviation under 10% falls within the category of "minor deviation."

Acting on the Second Circuit's directive, the District Court found that the simple population-based methodology offered in *Abate v. Mundt* was the appropriate choice, irrespective of the at-large representation—the maximum percentage deviation was to be determined by adding the percentage deviation above the population mean of the district with the greatest number of voters to the percentage deviation below the population mean of the district with the fewest number of voters (*id.* at 1467). In applying this formula, the disproportion between the population of Brooklyn (− 57.7% deviation) and Staten Island (+ 75.2% deviation) as calculated under the *Abate* test resulted in a maximum deviation of 132.9%, thereby clearly raising an appearance of unconstitutionality (*id.* at 1470, 1475). The District Court ultimately determined that further proceedings were necessary to ascertain whether the deviation was justified.

The defendant Board appealed to the Second Circuit, raising two issues: (1) whether the court below correctly adopted the *Abate* test, "which looks only to the relative power of voters to elect representatives, and therefore focuses almost entirely on the simple question of population per representative"; and (2) whether the court below "should have included the at-large representatives on the Board in any calculation of voting inequality" (*Morris v. Board of Estimate*, 831 F.2d 384 [2d Cir.1987] ).

The Board strenuously argued that the court should have applied the Banzhaf Index—to calculate the at-large representatives, instead of the strict population-based *Abate* test which computed only the representation per borough president—to measure the power of voters in the various boroughs to affect the outcome of a Board vote (*id.*). Applying the Banzhaf Index would have required inclusion of the at-large representatives since the outcome of a Board vote "will often turn on how one of the at-large members casts his vote" (*id.* at 387).

At this juncture, and for the sake of clarity in dealing with the heart of the issues in this case, it is necessary to discuss the "Banzhaf method," keeping in mind the cautionary words of the court in *Iannucci* to avoid being dragged unnecessarily into a "mathematical quagmire." The Court finds that perhaps the clearest explanation of the Banzhaf method appears in footnote 23 of the Supreme Court's opinion in *Whitcomb v. Chavis*, 403 U.S. 124, 162–163, 91 S.Ct. 1858, 1878–79, 29 L.Ed.2d 363 (1971).

*Whitcomb* was a legislative reapportionment case reversed by the Supreme Court upon a finding that there were impermissible variances between the Indiana senate and house districts which violated the Equal Protection Clause. The claims asserted in *Whitcomb* were based on the Banzhaf voting-power method of measuring voter equality. Writing for the majority, Justice White set forth the following:

"[t]he mathematical backbone of this theory is as follows: In a population of $n$ voters, where each voter has a choice between two alternatives (candidates), there are $2^n$ possible voting combinations. For example, with a population of three voters, A, B, and C, and two candidates X and Y, there are eight combinations:

|       | A | B | C |
|-------|---|---|---|
| # 1.  | X | X | X |
| # 2.  | X | X | Y |
| # 3.  | X | Y | X |
| # 4.  | X | Y | Y |
| # 5.  | Y | X | X |
| # 6.  | Y | X | Y |
| # 7.  | Y | Y | X |
| # 8.  | Y | Y | Y |

The theory hypothesizes that the true test of voting power is the ability to cast a tie-breaking, or critical vote. ·In the population of three voters as shown above, any voter can cast a critical vote in four situations; in the other four situations, the vote is not critical since it cannot change the outcome of the election. For example, C can cast a tie-breaking vote only in situations 3, 4, 5, and 6. The number of combinations in which a voter can cast a tie-breaking vote

is $2 \cdot \dfrac{(n--1)!}{\dfrac{n--1}{2}! \cdot \dfrac{n--1}{2}!}$, where $n$ is the

number of voters. Dividing this result (critical votes) by $2^n$ (possible combinations), one arrives at that fraction of possible combinations in which a voter can cast a critical vote. This is the theory's measure of voting power...." (403 U.S. at 146, n. 23, 91 S.Ct. at 1870, n. 23).

---

The Banzhaf strategy therefore attempts to weight the power of representatives to cast decisive votes in proportion to the population that each legislator represents.

The Supreme Court refused to adopt the Banzhaf analysis in *Whitcomb v. Chavis* because the "position remains a theoretical one" and was unrealistic in not taking into account "any political or other factors which might affect the actual voting power of the residents, which might include party affiliation, race, previous voting characteristics or any other factors which go into the entire political voting situation" (*id.* at 146, 91 S.Ct. at 1870). Additional discussion of the Banzhaf method is found later in this opinion. For the moment, it is enough to keep in mind that the crux of the Banzhaf theory is that the true test of voting power is the ability to cast a tie-breaking, or critical vote.

Dealing with the first prong of the defendant Board of Estimate's argument in *Morris,* the Second Circuit held that the District Court properly adopted the *Abate* theory "that what the equal protection clause requires be equalized among voters is their 'share' of representatives on the governmental body in question" (*Morris v. Board of Estimate,* 831 F.2d at 387). In the simplest of cases, where there is no weighted voting, *Abate* requires only "that the court look to the number of citizens in each representative's district; equality is achieved where those numbers are equal" (*id.*).

The Second Circuit rejected the Banzhaf analysis, noting that

"[w]e are similarly persuaded that the Banzhaf index is an insufficiently realistic measure of voter equality to provide the basis of a Fourteenth Amendment analysis of voter equality. It is unrealistic in a general sense involving voter motivation; and it is unrealistic in a particular sense as it applies to citizen voting power through the Board of Estimate. As a result, the Banzhaf index does not sufficiently reflect '[t]he real life impact of [the makeup of the Board of Estimate and the way its members are elected] on individual voting power ... to warrant departure from prior cases'" (*Morris v. Board of Estimate,* 831 F.2d at 390, quoting *Whitcomb v. Chavis,* 403 U.S. at 146, 91 S.Ct. at 1870).

In the end, the Second Circuit found that the Banzhaf analysis is "seriously defective in the way its measures Board members' power to determine the outcome of a Board vote" (*id.*).

In considering the fact that the Borough of Brooklyn was six times as populous as Staten Island, the Second Circuit found that there were "serious inequalities of representation" as the application of the *Abate* test demonstrated (*id.* at 392). In noting that the *Abate* test measures the representation of *people,* not of *interests,* the court stated that it had complied with the Supreme Court's insistence that the Equal Protection Clause requires "the equalization of voter representation, not interest representation" (*id.*). The court concluded that

". . . [t]he design of the Board, which gives equal weight to each borough's interests, has devalued concomitantly the votes of individual residents of Brooklyn and Queens, and has grossly overvalued the votes of Staten Island residents. The result is exactly what the Equal Protection clause forbids: 'the elevation of a small class of "supervoters" granted an extraordinarily powerful franchise'" (*id.* at 393, quoting *Brown v. Thomson,* 462 U.S. 835, 856, 103 S.Ct. 2690, 2703, 77 L.Ed.2d 214 [1983] [Brennan, J., dissenting]).

Having arrived at a maximum deviation from voter equality of 132.9%, the Second Circuit turned to the issue of whether the Board's structure was justified by "considerations of such moment that they outweigh this gross deviation from equality" (*id.*). The burden of justification rested with the defendants, and in the end, the Second Circuit held that the City's explanations for the variance neither required nor justified such a gross deviation (*id.*).

Having granted *certiorari,* the Supreme Court found that the Board of Estimate's structure was inconsistent with the Equal Protection Clause of the Fourteenth Amendment in that, although the boroughs had widely disparate populations, each had equal representation on the board (*New York City Bd. of Estimate v. Morris,* 489 U.S. 688, 692–703, 109 S.Ct. 1433, 1437–1443, 103 L.Ed.2d 717 [1989]).

The court agreed with the Second Circuit that "the population-based approach of our cases from *Reynolds* to *Abate* should not be put aside in this litigation" (*id.* at 698, 109 S.Ct. at 1440), and further observed that it had previously declined to accept the Banzhaf methodology, albeit in a different context, in *Whitcomb v. Chavis,* 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971). Following up on the Second Circuit's skepticism of the manner in which the defendant City of New York measured the power of Board of Estimate members to determine the outcome of a Board vote, the court through Justice White enunciated its strongest remarks to date concerning the method it preferred for assuring effective representation:

"[i]t may be that in terms of assuring fair and effective representation, the equal protection approach reflected in the *Reynolds v. Sims* line of cases is itself imperfect, *but it does assure that legislators will be elected by, and represent citizens in, districts of substantially equal size.* It does not attempt to inquire whether, in terms of how the legislature actually works in practice, the districts have equal power to affect a legislative outcome. This would be a difficult and ever-changing task, and its challenge is hardly met by a mathematical calculation that itself stops short of examining the actual day-to-day operations of the legislative body" (489 U.S. at 699, 109 S.Ct. at 1441) (emphasis supplied).

The Supreme Court did, however, differ with the Second Circuit on the issue of whether the presence of at-large members on the Board should be factored into the process of determining the deviation between the greater and lesser populated boroughs. The Supreme Court found the at-large members to be a "major component in the calculation and should not be ignored" (*id.* at 701, 109 S.Ct. at 1442). Looking to the pleadings filed with the District Court, the Supreme Court noted that the appellees indicated that the deviation would then be reduced to 78%—a deviation which the Court found was still not justifiable (*id.* at 702, 109 S.Ct. at 1442).

In finding the structure of the Board of Estimate to be violative of the Equal Protec-

tion Clause, the Supreme Court unanimously reaffirmed its position that the one person, one vote requirement applies to elected local governments. The Court was also unanimous in rejecting the Banzhaf Index for calculating the deviation of different sized districts from population equality.

The primary issue before this Court, in light of *Morris,* is whether the weighted voting structure of the Nassau County Board of Supervisors can survive the Supreme Court's rejection of the Banzhaf Index and its reaffirmation of the fundamental equal population voting district.

## II. *PROCEDURAL SETTING*

The defendants Nassau County Board of Supervisors and the individual supervisors sued in their official capacities move, pursuant to Fed.R.Civ.P. 56, for partial summary judgment dismissing the first and second causes of action. The defendants are not moving at this time with regard to the third cause of action, which asserts a violation of section 2 of the Voting Rights Act of 1965 based on dilution of voting strength.

The thrust of the defendants' argument is that the Supreme Court's prior summary adjudication in *Franklin v. Krause* is dispositive, and that the plaintiffs' challenge to the weighted voting system must be dismissed as a matter of law. The Board urges this Court to reject the plaintiffs' assertion that the Supreme Court's decision in *Board of Estimate v. Morris* has "implicitly overruled the line of previous judicial decisions upholding the constitutionality of the Board of Supervisors' weighted voting system" (Defendants' Memorandum of Law at p. 2).

### A. *Weighted Voting As Utilized By the Board of Supervisors*

The defendants state that the votes allocated to each member of the Board of Supervisors is determined according to Section 104 of the Nassau County Charter, which provides as follows:

"4. In determining and fixing the total number of votes, the distribution of votes among the supervisors, and the number of votes needed to pass particular measures, the board of supervisors shall as closely as possible apply and conform to the following standards:

a. There shall be a *modified weighted voting system.*

b. The total number of votes of all supervisors shall be no less than six, and shall not exceed the county's total population.

c. No fractional votes shall be used or recognized.

d. The total number of votes which each supervisor is entitled to cast shall not be divided and shall be cast as one unit.

e. *The voting power of a supervisor shall be measured by the mathematical possibility of his casting a decisive vote on a particular matter.*

f. The voting power of a town or city shall be deemed equal to the voting power of its supervisor except that the voting power of the town of Hempstead shall be deemed equal to the total power of its two supervisors.

g. The percentage of voting power of each town and city shall be greater than zero and shall approximate the town's or city's percentage of the total county population.

h. In preparing each reapportionment, the board of supervisors shall employ an independent computerized mathematical analysis and such other method or methods as shall most nearly equalize the percentage of voting power of each town and city to its percentage of the total county population" (emphasis supplied).

Using the Banzhaf Index, a citizen's voting power through each representative is calculated by dividing the representative's voting power by the square root of the population represented. According to the defendants, the distribution of votes among the supervisors, based upon the results of the 1980 census and the requirements of Section 104 of the Charter, is as follows:

- Presiding Supervisor, Town of Hempstead    30 votes
- Supervisor, Town of Hempstead    28 votes

- Supervisor, Town of Oyster Bay22 votes
- Supervisor, Town of North Hempstead15 votes
- Supervisor, City of Long Beach7 votes
- Mayor, City of Glen Cove6 votes

(Nassau County Local Law 2–1982).

---

A majority of 65 votes is required in order for the Board to pass any resolution. The defendants maintain that the Board of Supervisors has adopted the formula approved by the United States Supreme Court in *Franklin v. Krause,* 32 N.Y.2d 234, 344 N.Y.S.2d 885, 298 N.E.2d 68 (1973), *appeal dismissed,* 415 U.S. 904, 94 S.Ct. 1397, 39 L.Ed.2d 461 (1974). Applying that formula results in a maximum deviation from voter equality equal to 5.25%. This figure represents the calculation of the Town of Hempstead's deviation of −2.07% with the City of Long Beach's +3.19%. To illustrate, the defendants present the following chart:

| Municipality | Population | Percent of Pop. | Percent Voting Power | Deviation |
|---|---|---|---|---|
| Hempstead | 738,517 | 55.92% | 53.85% | −2.07% |
| Oyster Bay | 305,750 | 23.12% | 21.15% | −1.97% |
| No. Hempstead | 218,624 | 16.53% | 17.31% | + .78% |
| Long Beach | 34,073 | 2.58% | 5.77% | +3.19% |
| Glen Cove | 24,618 | 1.86% | 1.92% | + .06% |

---

According to the defendants, this model reflects the existing structure of the Board of Supervisors.

The defendants made a lengthy analysis of the prior challenges to the constitutionality of the weighted voting system in Nassau County. Essentially, however, the defendants argue that the Supreme Court's determination in *Franklin v. Krause* is dispositive and is not diluted by *Board of Estimate v. Morris:*

"[i]n *Board of Estimate v. Morris,* the Supreme Court did not reject the Banzhaf method as a means to determine the weight to be assigned a legislator's vote in a weighted voting system. That issue was simply not presented. The Supreme Court's criticism of the Banzhaf method in *Board of Estimate v. Morris* was limited to its unreliability as a tool for measuring deviation.... Nor can it be successfully argued that the Supreme Court signaled a doctrinal change by its renewed criticism of the Banzhaf method as a tool for measuring deviation" (Defendants' Memorandum of Law at p. 30).

The defendants further argue that the Supreme Court criticized the Banzhaf method as a means to determine deviation and specifically note that the Nassau County Board of Supervisors does not utilize the Banzhaf method for this purpose. Stressing that *Morris* did not involve a challenge to weighted voting, the defendants state that such voting is designed to allocate voting power to a legislator based upon the percentage of the residents of the county residing in his town. According to the defendants, such a system is clearly distinguishable from the system examined in *Morris* which "gave an additional vote to the citywide members to ensure that the three citywide members could constitute a majority" and which, "given the significant difference in population between the city and the boroughs" clearly shows that the "votes were not weighted based on population" (Defendant's Memorandum of Law at p. 34).

The defendants conclude that *Morris* involved questions of appropriate methodology for determining percentages of deviation from ideal population in a "non-weighted voting model" and as such, the Supreme Court has left intact the formula approved in *Franklin v. Krause*:

"... the Nassau County Charter requires the use of a modified Banzhaf method solely to determine the allocation of the weighted votes to each member.... At no point has the Board of Supervisors utilized the Banzhaf method to measure the degree to which a given system deviates from the constitutional requirement of 'one person, one vote' " (Defendants' Memorandum of Law at p. 35).

### B. *The Plaintiffs' Response*

The plaintiffs begin with a rebuttal to the defendants' vigorous assertion that *Franklin v. Krause* is dispositive of the constitutional challenges raised in this action. According to the plaintiffs, the Board ignores two propositions which restrict the precedential impact of summary adjudications by the Supreme Court:

"[f]irst, a summary dismissal for want of a substantial federal question will not be accorded full precedential effect where more recent 'doctrinal developments' depart from the earlier summary decision. *Hicks v. Miranda,* 422 U.S. 332, 344 [95 S.Ct. 2281, 2289, 45 L.Ed.2d 223] (1975). Second, the precedential effect of a summary adjudication is limited to the 'precise issues presented and necessarily decided' by the Court in its summary disposition. *Mandel v. Bradley,* 432 U.S. 173, 176 [97 S.Ct. 2238, 2240, 53 L.Ed.2d 199] (1977). In moving for summary judgment, the Board seriously discounts the significance of the Supreme Court's post-*Franklin* rejection of the Banzhaf methodology in *Morris.* Moreover, the defendant Board ignores new issues presented in this case that were not before the Court in *Franklin* or the Second Circuit in *League of Women Voters* " (Plaintiffs' Memorandum of Law at p. 4).

Those new issues concern the purported misallocation of votes in the weighted voting plan of Nassau County at both the majority and two-thirds decision rule levels. As an example, the plaintiffs state that in their opportunities to form critical coalitions and cast deciding votes, Oyster Bay and North Hempstead have virtually the same voting power even though the population of North Hempstead is only approximately two-thirds the population of Oyster Bay (see Table B, p. 528). According to the plaintiffs, these allocations of voting power have not been raised in any prior challenge to the weighted voting plan, and therefore are not precluded by the summary disposition in *Franklin v. Krause.*

In their Rule 3(g) Statement, the plaintiffs take issue with the defendants' assertion that in Nassau County's weighted voting system, legislators are assigned a number of votes based on their voting power. In reality, the plaintiffs contend, although legislators are presumably assigned votes in that fashion, the actual allocation of votes does not always correspond with voting power. For example, as discussed in further detail below, the representatives of Oyster Bay and North Hempstead are allocated 22 and 15 votes respectively, yet when an action calls for a two-thirds vote, the two representatives exercise the same voting power—they can each form critical coalitions in nine (9) instances (see Table B, *infra*). In addition, the plaintiffs argue that the County's position that voting power should be measured by the mathematical probability of a Supervisor's casting a decisive vote assumes that all possible vote outcomes are equally likely—an assumption that was discredited by the Supreme Court in *Morris.*

The Banzhaf method presumes that each Supervisor acts independently, so that on any given vote, a Supervisor is as likely to cast a "yes" vote as a "no" vote. However, this assumption is belied by the fact that most, if not all the time, the two Hempstead Supervisors vote as a partisan bloc. Therefore, the plaintiffs rely upon Professor Banzhaf's observation that the application of the index in Nassau County is inappropriate because "the voting power of Hempstead is not simply the total of the voting power of its two representatives" (Plaintiffs' Rule 3(g) Statement, ¶ 7,

citing Russell Redman, *One Man, One Vote,* Empire State Report, Dec. 1991).

The plaintiffs further assert that because Nassau County continues to make the incorrect calculation of the deviation of percentage of voting power from the percentage of population, the percentage of voting power of each Supervisor does not approximate his municipality's percentage of the County's population. According to the plaintiffs, the computerized mathematical analysis commissioned by the Board uses these faulty calculations in a fashion which does not operate to equalize each Supervisor's percentage of voting power with the respective municipality's percentage of the County's population.

In support of their arguments, the plaintiffs have submitted the affidavits of Honey Kober, Esq., counsel to plaintiff David Ford, and Steven J. Abrams, Ph.D., a professor of politics at New York University. The affidavit of Ms. Kober, submitted on behalf of all the plaintiffs, includes as an exhibit the Jurisdictional Statement which was submitted to the Supreme Court in *Franklin v. Krause,* 415 U.S. 904, 94 S.Ct. 1397, 39 L.Ed.2d 461 (1974).

Steven J. Abrams holds a Ph.D. in Political Science from Northwestern University and is an expert in the application of mathematical models to electoral systems. He has published several books and articles on this subject. According to Prof. Abrams, he prepared his affidavit based on his review of (1) the complaint in this action; (2) the Board of Supervisors' summary judgment motion; and (3) documents relating to the Nassau County weighted-voting plan which were furnished to him by plaintiffs' counsel during the course of discovery (Abrams Affidavit, ¶ 3).

It is Prof. Abrams' belief that the Board's weighted-voting plan is unconstitutional in that it "suffers from several significant defects that deprive Nassau County citizens of representation proportional to their populations" (¶ 2). For example, Prof. Abrams notes that while 108 votes are allocated to the Board on the basis of the 1980 census data, a majority vote requires not a simple majority of 55, but rather a special majority of 65 votes. A two-thirds majority requires 72 votes. Prof. Abrams refers to these two types of votes as "decision rules" (¶ 7). This "super-majority" results in disproportionate representation for Hempstead when compared to the smaller towns.

With regard to the current allocation of votes to the Supervisors, as demonstrated in Tables A and B below, Prof. Abrams concludes that there are two major defects: (1) the "enormous overallocation of voting power to Long Beach vis-a-vis Glen Cove"; and (2) a serious misallocation of votes at the two-thirds decision rule level resulting in the towns of Oyster Bay and North Hempstead having "exactly the same voting power, even though the weighted votes (and the population) of North Hempstead are only approximately two-thirds of the votes (population) of Oyster Bay" (¶¶ 8–9).

With regard to the overallocation between Long Beach and Glen Cove, Abrams points to the fact that Long Beach's population (34,073) is approximately 37% greater than that of Glen Cove (24,618) and Long Beach is allocated 17% more votes (7 for Long Beach versus 6 for Glen Cove). However, as Abrams asserts, "this hardly justifies Long Beach's having 200% more voting power than Glen Cove" when you look at the comparative number of critical coalitions each can form (¶ 19) (see Tables A and B below). At the two-thirds decision rule level as noted above, Oyster Bay and North Hempstead can each form critical coalitions in nine situations despite their divergent allocations of 22 and 15 votes respectively.

Abrams states that these defects compel the conclusion that Nassau County's allocation of votes under its present Banzhafian weighted-voting plan violates the "one person, one vote" principle of the Constitution. To illustrate these alleged defects in the majority and two-thirds decision rules, Prof. Abrams has provided several tables. In the first illustration, he demonstrates the number of critical coalitions for each of the Supervisors in a random "special majority" vote (65 votes required):

## TABLE A

### Weighted Voting in Nassau County—1982 (Special Majority)

| Municipality | Weighted Votes | Critical Coalitions |
|---|---|---|
| Hempstead | 30 | 15 |
| | 28 | 13 |
| | 58 | 28 |
| Oyster Bay | 22 | 11 |
| North Hempstead | 15 | 9 |
| Long Beach | 7 | 3 |
| Glen Cove | 6 | 1 |
| **Total** | 108 | 52 |

Prof. Abrams points out that Long Beach, with only one vote more than Glen Cove, actually has three times the voting power of Glen Cove in that it can form a critical coalition in three times as many situations.

At the two-thirds decision rule level (72 votes required), Prof. Abrams contends that the inconsistency is even more blatant, as observed in this second table:

## TABLE B

### Weighted Voting in Nassau County—1982 (Two–Thirds Majority)

| Municipality | Weighted Votes | Critical Coalitions |
|---|---|---|
| Hempstead | 30 | 13 |
| | 28 | 11 |
| | 58 | 24 |
| Oyster Bay | 22 | 9 |
| North Hempstead | 15 | 9 |
| Long Beach | 7 | 3 |
| Glen Cove | 6 | 1 |
| **Total** | 108 | 46 |

In this scenario, although Oyster Bay is allocated 22 votes and North Hempstead is allocated 15, they hold the very same voting power because they can each form critical coalitions in nine situations. Consequently, Oyster Bay and North Hempstead have exactly the same voting power even though the weighted votes and population of North Hempstead are approximately only two-thirds of the votes and population of Oyster Bay.

Prof. Abrams suggests that analysts may differ on the proper way to equalize voting power across municipal lines. However, he adds that "no model, in my opinion, can justify allocating the same voting power to the Supervisors of North Hempstead and Oyster Bay. The fact that this allocation occurs at the higher decision rule, at which more important items are voted on by the Board, makes it all the more egregious" (¶ 10). He maintains that this misallocation deceives the citizens of Oyster Bay into believing that their seven additional votes actually have meaning, when in fact the votes have absolutely no significance at the two-thirds rule. The additional arguments made by Prof. Abrams with regard to deviation from numerical equality are discussed in Point IV.

In sum, the plaintiffs argue that the Supreme Court thoroughly repudiated the Banzhaf methodology in *Morris* and that the defendants' contention that *Morris* did not signal a new doctrinal development sufficient to diminish the force of *Franklin v. Krause* is simply erroneous. In concluding their arguments, the plaintiffs assert the following:

"[t]he argument that, in *Morris,* the Supreme Court rejected only the use of the Banzhaf methodology to defend an electoral system and not the affirmative use of the Banzhaf approach in adopting an electoral system, defies logic and ignores the entire thrust of the criticism of Banzhaf set forth in the *Morris* decision. The Court's conclusion that the Banzhaf approach is too narrow and unrealistic with respect to the interests of voters and with respect to the behavior of legislators holds true whether, as in *Morris,* the Banzhaf system is being deployed to defend a particular electoral regime or whether, as here, it was affirmatively adopted as a method of satisfying 'one person, one vote' principles" (Plaintiffs' Memorandum of Law at p. 17).

## C. The Defendants' Reply

The defendant Board of Supervisors asserts that by its papers, it has established: (1) that *Morris* did not review a population-based weighted voting plan; (2) that *Morris* simply reiterated and applied the principles set forth in *Whitcomb v. Chavis,* 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971) and did not signify a "doctrinal change" from the 1973 ruling in *Franklin v. Krause* ; and (3) that the Supreme Court's criticism of the Banzhaf method in *Whitcomb v. Chavis* and *Morris* was necessarily limited to its use as a tool to measure deviation, and that the Board does not use Banzhaf to measure deviation, but rather utilizes the method approved in *Franklin v. Krause* (Defendants' Reply Memorandum of Law at pp. 1–2).

According to counsel for the defendants, the plaintiffs have failed to dispute that *Morris* did not involve a population-based weighted voting plan, and have failed to point to any language in *Morris* that even suggests that *Franklin v. Krause* has been overruled. The defendants further claim that the plaintiffs' assertions of "mathematical errors" are identical to the arguments set forth and rejected in *League of Women Voters* and *Bechtle,* thereby precluding review by this Court.

The defendants contend that the Supreme Court's first criticism of the Banzhaf method as an unrealistic approach for determining whether citizens have an equal voice in electing their representative is derived from *Whitcomb v. Chavis* and does not involve a method employed by Nassau County. The second criticism of the Banzhaf Index concerning its measurement of the behavior of legislators in casting critical votes is also not applicable to the instant case, according to the defendants, because the "actual voting pattern of the legislator is not relevant to the question of whether he was allocated a constitutionally appropriate number of votes" (id. at p. 8).

The defendants reiterate that *Franklin v. Krause* is controlling law in the instant case, and that the formula enunciated in *Franklin* is consistent with *Abate v. Mundt.* Because the Supreme Court in *Morris* determined that the at-large Board members had to be calculated into the equation, the defendants contend that *Morris* effected a significant modification of the *Abate* test, and that *Abate* does not mandate a specific formula, but simply that whatever formula is used must be population-based.

Finally, the defendants claim that there is nothing new in the plaintiffs' argument concerning alleged mathematical errors in the *Franklin v. Krause* formula. According to counsel, "[i]t is the same tired argument that courts at both the State and Federal level have rejected over the past two decades.... Simple arithmetic computations illustrate that plaintiffs are making the same attack, but merely labeling it differently" (id. at pp. 17–18).

## III. *THE GOVERNING LAW*

### A. *The Statutory Provisions*

The Equal Protection Clause of the Fourteenth Amendment provides as follows:

"Section 1. ... No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the

United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

The plaintiffs also seek redress under 42 U.S.C. § 1983, which provides in pertinent part as follows:

> "**§ 1983. Civil action for deprivation of rights**
>
> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . ."

### B. *Summary Judgment Standard*

■ A court may grant summary judgment "only if the evidence, viewed in the light most favorable to the party opposing the motion, presents no genuine issue of material fact," *Cable Science Corp. v. Rochdale Village, Inc.*, 920 F.2d 147, 151 [2d Cir.1990], and the movant is entitled to judgment as a matter of law (*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 [1986]; *see also* Fed. R.Civ.P. 56[c] ). The Court must, however, resolve all ambiguities and draw all reasonable inferences in the light most favorable to the party opposing the motion (*see Twin Laboratories, Inc. v. Weider Health & Fitness*, 900 F.2d 566, 568 [2d Cir.1990]; *Liscio v. Warren*, 901 F.2d 274, 276 [2d Cir.1990]; *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 [2d Cir.1986], *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 [1987] ).

■ Once a party moves for summary judgment, in order to avoid the granting of the motion, the non-movant must come forward with specific facts showing that a genuine issue for trial exists (*Western World Ins.*

*Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 [2d Cir.1990] [quoting Fed.R.Civ.P. 56(e) ]; *see National Union Fire Ins. Co. v. Turtur*, 892 F.2d 199, 203 [2d Cir.1989] ).

### IV. *DISCUSSION*

What is clear from *Morris* is that the Supreme Court rejected the conventional method of selecting members to the Board of Estimate as being violative of the Equal Protection Clause of the Fourteenth Amendment. In reaching that conclusion, "the Supreme Court unanimously reaffirmed that the one-person, one-vote requirement applies to elected general purpose local governments. The Court was also unanimous in rejecting the Banzhaf Index for calculating the deviation of different sized districts from population equality" (M. David Gelfand and Terry A. Allbritton, "Conflict and Congruence in One–Person, One–Vote and Racial Vote Dilution Litigation: Issues Resolved and Unresolved by *Board of Estimate v. Morris*," 6 J.L. & Pol. 93 [1989][1]).

Because the Supreme Court addressed a local governmental body whose make-up and voting patterns are not identical to those of the Board of Supervisors in Nassau County, the defendants urge that this Court must ignore *Morris* and instead be bound by the 1973 holding of *Franklin v. Krause*. The Court cannot wear such judicial blinders.

"Weighted voting" in the context of the Board of Supervisors essentially refers to "the assignment of differential weights to the votes of representatives" (6 J.L. & Pol. 93, at n. 95) as distinct from the former practice of giving additional weight to certain segments of voters, particularly those from rural areas, which was held to be unconstitutional in *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). Weighted voting has been used as a device for satisfying the one person, one vote requirement while simultaneously preserving electoral districts which may have wide variations in population.

1. M. David Gelfand is Professor of Law and Director of the Appellate Advocacy Program, Tulane Law School; Terry E. Allbritton is Associate Professor of Clinical Law and Associate Director of the Appellate Advocacy Program at Tulane Law School.

What, then, is this Court to examine concerning the principle of one person, one vote in the context of a weighted voting plan as it is utilized by the Nassau County Board of Supervisors? First, the Court draws attention to an initial distinction between *Morris* and the instant case—the emphasis in *Morris* was upon the relative power of *voters* in the various boroughs to affect decisions of the Board of Estimate, which involved the weighted voting of three citywide members. This case focuses instead on a determination of the voting power of the six individual *Supervisors* on the Nassau County Board, a governing body which itself should reflect the ability of the citizenry in the respective geographic locations to have an impact on Board decisions.

Although New York City did not employ a weighted voting system per se, the issue of weighted voting was raised at varying points throughout the *Morris* litigation. The nub of the instant case lies in a determination of whether this kind of weighted voting has survived the Supreme Court's rejection of the Banzhaf method.

### A. *What did the Supreme Court Actually Say About "Weighted Voting" in Board of Estimate v. Morris?*

■ The defendant Board of Supervisors maintains that the Supreme Court did not substantively consider weighted voting in *Morris*. This Court disagrees. A close reading of *Morris* reveals that the Supreme Court discussed weighted voting in several sections of the opinion, and although the court may not have expressly stated "here is our pronouncement on weighted voting," the import of the language dealing with weighted voting is inescapable. The Court notes the following examples:

"[s]pecifically, the city focuses on the relative power of the voters in the various boroughs to affect board decisions, *an approach which involves recognizing the weighted voting of the three citywide members.*

As described by the Court of Appeals ... the method urged by the city to determine an individual voter's power *to affect the outcome of a board vote first calculates the power of each member of the board to affect a board vote, and then calculates voters' power to cast the determining vote in the election of that member.* This method, termed the Banzhaf Index, applies as follows: 552 possible voting combinations exist in which any one member can affect the outcome of a board vote (*Morris,* 489 U.S. at 697 [109 S.Ct. at 1440]) ...;

and again at page 698, 109 S.Ct. at page 1440:

"We agree with the reasons given by the Court of Appeals that the population-based approach of our cases from *Reynolds* through *Abate* should not be put aside in this litigation.... In [*Whitcomb v. Chavis* ] we observed that the Banzhaf methodology '*remains a theoretical one* ' and is *unrealistic in not taking into account 'any political or other factors which might affect the actual voting power of the residents,* which might include party affiliation, race, previous voting characteristics or any other factors which go into the entire political voting situation' [citation omitted].

The personal right to vote is a value in itself, and a citizen is, without more and *without mathematically calculating his power to determine the outcome of an election* shortchanged if he may vote for only one representative when citizens in a neighboring district, of equal population, vote for two; or to put it another way, if he may vote for one representative and the voters in another district half the size also elect one representative....

and at page 699, 109 S.Ct. at page 1441:
The Court of Appeals also thought that the city's approach was 'seriously defective in the way *it measures Board members' power to determine the outcome of a Board vote.* ' 831 F.2d, at 390. The difficulty was that this method *did not reflect the way the board actually works in practice; rather, the method is a theoretical explanation of each board member's power to affect the outcome of board actions....* It does not attempt to inquire whether, in terms of how the legislature actually works in practice, the districts have *equal power to affect a legislative outcome.* This would be a difficult and ever-changing task, and

its challenge is *hardly met by a mathematical calculation that itself stops short of examining the day-to-day operations of the legislative body* (emphasis supplied). What is clear from these excerpts, and what the defendants seek to minimize, is that the Supreme Court firmly rejected weighted voting, not only because of the mathematical quagmire such a system engenders, but just as importantly because the methodology fails to take into account other critical factors related to the actual daily operations of a governing body. There is no question that the Supreme Court took the opportunity to express not only a preference, but a directive that legislators be elected by and represent citizens in districts of substantially equal size.

Although as the defendants point out, the method of "weighting" in *Morris* (multiple votes of the citywide members) is different from that of the Nassau County Board of Supervisors (multiple votes based upon percentage of population represented), the impact is very similar—the methodology further removes voters from the principle of "one person, one vote" and institutionalizes a parallel structure in the Board's exercise of its functions. In this Court's view, there is only an artificial and non-substantive distinction between the basis for rejecting weighted voting in the *Morris* case and for retaining weighted voting as the method of operation for the Board of Supervisors in this case.

This conclusion is further supported by footnote eight in the *Morris* opinion, where in distinguishing the circumstances it was then considering from those it had previously reviewed in *Avery v. Midland County*, 390 U.S. 474, 88 S.Ct. 1114, 29 L.Ed.2d 45 (1968), the Supreme Court noted that "[i]n that case [*Avery*] however, we were not faced with the task of determining the disparity in voting power among districts of different population" (*Morris*, 489 U.S. at 701 n. 8, 109 S.Ct. 1442 n. 8). In *Morris*, the court was fully cognizant of the difficulties inherent in a weighted voting system. Having reviewed not only the case itself but also the briefs submitted to the Supreme Court by both parties, this Court finds the reasoning in *Morris* to be determinative of the issue of weighted voting.

## B. Reaffirmation of Abate v. Mundt

The Supreme Court has repeatedly held that

"Population is ... the *starting point* for consideration and the *controlling criterion* for judgment in legislative apportionment controversies" (*Reynolds v. Sims*, 377 U.S. 533, 567, 84 S.Ct. 1362, 1384 [12 L.Ed.2d 506] [1964]; *see Abate v. Mundt*, 403 U.S. at 185, 91 S.Ct. at 1906).

In *Wesberry v. Sanders*, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964), the Supreme Court determined that the Equal Protection guarantee of "one person, one vote" extended to congressional districting plans. *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), subsequently mandated that state legislative election districts must have equal populations, as nearly as practicable. This rule was extended to local government apportionment; *Avery v. Midland County*, 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968) and *Abate v. Mundt*, 403 U.S. 182, 91 S.Ct. 1904, 29 L.Ed.2d 399 (1971); to school boards; *Hadley v. Junior College Dist. of Metropolitan Kansas City*, 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970); and most recently to municipal election districts in *New York City Bd. of Estimate v. Morris*, 489 U.S. 688, 109 S.Ct. 1433, 103 L.Ed.2d 717 (1989). The Supreme Court has left no doubt that the *Reynolds–Abate* equal population approach should not be put aside in favor of the theoretical Banzhaf Index. The Court finds this line of authority controlling in the instant case.

In comparing the *Abate* test with weighted voting, Prof. Abrams asserts that the second significant problem with Nassau County's application of the Banzhaf Index "is the way in which the County determines the total deviation of its weighted voting model from the ideal allocation of voting power based upon population" (Abrams' Affidavit, ¶ 13). In the context of *Abate*, Abrams notes the following:

"... Nassau County calculates the difference between the percentage of population and the percentage of voting power but does not consider that discrepancy in relation to the ideal voting power which should be allocated under a system of strict nu-

merical equality. This measurement, which yields an absolute deviation (as opposed to one that is relative to an ideal apportionment of voting power), is problematic because it creates numerical values that do not fit within the Supreme Court's jurisprudence....

The relative *total* deviation in Nassau County under the current weighted-voting plan, when calculated under the formula suggested by the Supreme Court in *Abate v. Mundt,* 403 U.S. 182 [91 S.Ct. 1904, 29 L.Ed.2d 399] (1971), is 136% (as opposed to an absolute deviation of 8 percentage points). This is mostly due to the extreme overrepresentation of Glen Cove" (¶¶ 14, 16).

The Court also finds persuasive Prof. Abrams' analysis of *Franklin v. Krause* and *League of Women Voters v. Nassau County Bd. of Supervisors,* which leads the Court to conclude that there is a significant possibility that the mathematical calculations in those two cases, based upon information provided by the parties, may have resulted in erroneous conclusions concerning actual deviations from equal population.

■ Having reviewed the submissions of both parties in the instant case and having heard oral argument of the motions, the Court finds that: (1) the plaintiffs have raised new issues that are not identical to those asserted in *Franklin v. Krause* and *League of Women Voters v. Nassau County Bd. of Supervisors;* and (2) because of the nature of the summary affirmance, *Franklin v. Krause* is not controlling in this case. The Court further notes that although *Morris* may not have signalled a "doctrinal change" as the defendants assert, there is no doubt that *Morris* reasserted and reaffirmed the bedrock constitutional doctrine of one person, one vote—and the preferred method of apportionment based on equal population voting districts.

■ Applying the *Abate* test, and using the figures from the 1980 census which were provided to the court in *League of Women Voters,* the Court has arrived at its own calculation of the deviation from equal population representation in Nassau County, as reflected in the table below. The Court has first computed the total sum of the population figures from the five municipalities whose representatives comprise the Board of Supervisors. Following *Abate,* the Court has then divided the total population (1,321,582) by the number of Supervisors (6) to arrive at a mean or ideal population (220,264). The mean/ideal population (220,264) is then subtracted from the individual town population (i.e., Oyster Bay), and the result is then divided by the mean/ideal population to arrive at the percentage of deviation. The formula appears as follows:

$$\frac{\text{City/Town Population} - \text{Mean/Ideal Population}}{\text{Mean/Ideal Population}} = \text{Percentage of Deviation}$$

Visually translated and set forth, the deviation table appears as follows:

| Municipality | Population * | Deviation from Ideal Population ** |
|---|---|---|
| Hempstead | 738,517 | − 235.0% |
| Oyster Bay | 305,750 | − 38.8% |
| North Hempstead | 218,624 | + 0.7% |
| Long Beach | 34,073 | + 84.5% |
| Glen Cove | 24,618 | + 88.8% |
| Total: | 1,321,582 | |

\* Mean/Ideal Population = 220,264
\*\* Maximum Deviation = 156.44%

There is no question that in applying the *Abate* test in Nassau County solely on the basis of population, without any consideration of weighted-voting, the current deviation from equal population voting as reflected in the Board of Supervisors is impermissibly large and therefore unconstitutional. The Court can think of no reasoning which might be offered by the Board which could justify a deviation of 156.44%. The Court therefore finds that under either the *Abate* test or the Banzhaf Index, the present configuration of the Board of Supervisors violates the one person, one vote principle as encompassed in the Equal Protection Clause of the Fourteenth Amendment.

## C. *Post–Morris Decisions*

The handful of apportionment cases decided since *Morris,* provide little insight with regard to the application of its holding (*see, e.g., French v. Boner,* 786 F.Supp. 1328 [M.D.Tenn.1992] [although city council districts were malapportioned in light of most recent 1990 federal decennial census, municipal government apportionment scheme did not violate equal protection where city government had plan for decennial reapportionment not yet effected]; *Cunningham v. Municipality of Metropolitan Seattle,* 751 F.Supp. 885 [W.D.Wash.1990] [system of selecting Metro Council members by regional grouping results in impermissibly disproportionate representation, of the kind rejected in *Reynolds* and *Morris* ]; *Winburn v. Bennington–Rutland Supervisory Union,* 732 F.Supp. 29 [D.Vt.1990] [Equal Protection Clause's guarantee of equal voting strength as noted in *Morris* not applicable since Board members were appointed rather elected] ).

The only case dealing even peripherally with weighted voting since *Morris* is a case concerning Suffolk County which was commenced in Nassau County in 1989. In *Curcio v. Boyle,* 142 Misc.2d 1030, 542 N.Y.S.2d 1005 (Sup.Ct., Nassau Cty.1989), *rev'd* 147 A.D.2d 194, 542 N.Y.S.2d 1009 (2d Dept. 1989), the proponents of an initiative to amend Suffolk County Charter § C7–2 to substitute a system of weighted voting by a Board of Supervisors in place of the existing single member district legislature brought an Article 78 proceeding challenging the County Attorney's rejection of the measure. Among the reasons given by the County Attorney for rejecting the proposal were: (1) the decision of the United States Supreme Court in *New York City Bd. of Estimate v. Morris,* 489 U.S. 688, 109 S.Ct. 1433, 103 L.Ed.2d 717 (1989) which "prohibits the adoption of the proposed system of weighted voting"; and (2) the proposed weighted voting system implemented by a Board of Supervisors would violate the Voting Rights Act of 1965 (*Curcio v. Boyle,* 142 Misc.2d 1030, 542 N.Y.S.2d 1005, 1006 (Sup.Ct., Nassau Cty.1989).

The Supreme Court, Nassau County ruled in *Curcio* that the charter revision proposal was not on its face violative of the Equal Protection Clause and should have been submitted to the electorate as part of the charter's initiative and referendum provision (*id.*). On appeal, the Appellate Division, Second Department reversed, finding that "[a]s proponents of a weighted voting plan, the petitioners bear the burden of proving that their proposal will comport with the 'one person, one vote' requirement imposed by the Equal Protection Clause of the Fourteenth Amendment" (*Curcio v. Boyle,* 147 A.D.2d 194, 542 N.Y.S.2d 1009, 1011 [2d Dept.1989] ). The Court further found that the lack of such information in the proposal required its rejection (*id.*). No reference was made by the Appellate Division to the *Morris* case.

## D. *"One Person, One Vote" in Nassau County*

Prof. Banzhaf, who clearly has an interest in the application of his methodology, has observed that the Complaint and Answer in the instant case suggest that "neither side completely understands this complicated mathematical technique." [2] He adds that the Banzhaf Index has not been properly applied by Nassau County and yet, ironically, even if it had been, "the distribution of voting power

**2.** Excerpted from the November 14, 1991 letter from Prof. John F. Banzhaf, III, addressed to the Court and copied to all parties in this action, at page 2.

among the six legislators under the current system is constitutionally flawed." [3] Having reviewed the pleadings, Banzhaf concluded that the plaintiffs reached the correct conclusion, but for the wrong reasons. It appears to the Court that these "wrong reasons" are the same as those espoused by Prof. Abrams which have been discussed above.

Prof. Banzhaf and Prof. Abrams are joined in their conclusion that weighted voting as applied in Nassau County is unconstitutional by Prof. Scarrow, a faculty member from the State University of New York at Stony Brook and a scholar in the complex field of New York politics, whose expertise was called upon in *League of Women Voters v. Nassau County Bd. of Supervisors.* According to Prof. Scarrow, in the wake of *Morris,* weighted voting can no longer be used (*see* NEW YORK TIMES, July 11, 1989, at A18, col. 5 [letter to the editor by H. Scarrow]). This Court agrees, at least in so far as the "mathematical quagmire" presently existing in Nassau County is concerned.

The Court finds that the statistical applications utilized in the voting pattern of the Nassau County Board of Supervisors are not only artificial and contrived, but are completely incomprehensible to most citizens, and impossible to fathom except by experts. The Board cannot work on the basis of a simple majority, usually the standard in most legislative bodies, because allocating 55 votes to the Town of Hempstead insures that Hempstead would control every vote taken. Conversely, creating a "supermajority" of 65 votes insures that the residents of Hempstead will forever be underrepresented on the basis of population in any vote taken. There are basic flaws in the structure of this system.

Further, the Court finds unpersuasive the argument that the present structure preserves town and city lines and contiguous boundaries. Preservation of town lines cannot obstruct constitutional mandates. The existing assembly districts and congressional districts on Long Island which serve constituents from two counties or more have proven workable. In addition, the Court points to the adjoining County of Suffolk in which the residents have been represented by a county legislature with districts delineated on the basis of approximately equal population, without sacrificing town lines, for a considerable period of time.

The present structure of government in Nassau County is one in which virtually none of its citizens understands or appreciates the method by which his or her elected representatives vote. The citizens would, with reasonable certainty, however, understand the concept of being represented by one elected individual in a legislative district that is apportioned on the basis of equal population under the principles enunciated in *Abate* and its progeny. Such representation not only conforms with *Morris* and the Federal Constitution, it also makes plain sense.

Having reviewed all of the issues in this case, the Court finds that weighted voting as it is presently utilized by the Nassau County Board of Supervisors is unconstitutional, in that it violates the one person, one vote principle encompassed by the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

## V. CONCLUSION

In view of the above findings, the motion by the defendants Nassau County Board of Supervisors and the individual supervisors sued in their official capacities, for partial summary judgment, pursuant to Fed. R.Civ.P. 56, dismissing the first and second causes of action is denied.

At oral argument of this motion, all parties advised the Court that there were no material issues of fact but only questions of law to be decided by the Court with regard to the first and second causes of action. "The grant of summary judgment for the nonmoving party clearly is proper if both sides agree that there are no material fact issues...." (10A C. Wright, A. Miller & M. Kane, FEDERAL PRACTICE AND PROCEDURE: Civil 2d, § 2720, at 29 [2d ed. 1983]). The weight of authority is that summary judgment may be rendered in favor of the opposing party even though that party

---

3. November 14, 1991 Banzhaf letter at page 9.

has made no formal cross-motion under Rule 56 (*id.*). This practice is in keeping with the objective of Rule 56 to expedite the disposition of cases as well as with the "mandate of Rule 54(c) requiring the court to grant the relief to which a party is entitled 'even if the party has not demanded such relief in his pleadings'" (*Dempsey v. Town of Brighton*, 749 F.Supp. 1215, 1220 [W.D.N.Y.1990], *aff'd sub nom. Curenton v. Town of Brighton*, 940 F.2d 648 [2d Cir.], *cert. denied*, —— U.S. ——, 112 S.Ct. 338, 116 L.Ed.2d 278 [1991], quoting FEDERAL PRACTICE AND PROCEDURE: Civil 2d, § 2720, at 33; *see also Project Release v. Prevost*, 722 F.2d 960, 969 [2d Cir.1983]; *Lowenschuss v. Kane*, 520 F.2d 255 [2d Cir.1975]; *Sterling Drug Inc. v. Harris*, 488 F.Supp. 1019, 1029 n. 17 [S.D.N.Y.1980]).

The Court finds that the original movants, the defendants Board of Supervisors and the individual supervisors sued in their official capacities, had a full and fair opportunity in their papers and during oral argument to dispute any of the facts which were material to all the issues concerning the weighted voting system used by Board. Accordingly, the Court finds that there are no material issues of fact in dispute, and that the plaintiffs are entitled to partial summary judgment as a matter of law on their first and second causes of action.

This case is set down for a conference on April 26, 1993, at 9 a.m., in Courtroom "A" of the Uniondale Courthouse, to: (1) determine the specific relief to be afforded the plaintiffs in light of this Opinion and Order; (2) discuss the status of the case; and (3) discuss the future course of the litigation and the outstanding third cause of action brought under section 2 of the Voting Rights Act.

**SO ORDERED.**